## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

|  |  |  |
|---|---|---|
| JONATHAN M. BANTA, and<br>THE 44 GROUP, LLC, | ) | Civil Action No.: |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) | **COMPLAINT** |
| vs. | ) | **Slander Per-Se; Breach of Contract;** |
|  | ) | **Breach of  Contract (Handbook);** |
| WACCAMAW DERMATOLOGY, LLC | ) | **Breach of Contract Accompanied by a** |
| and JOAN M. WISS, M.D., individually | ) | **Fraudulent Act; Promissory Estoppel;** |
| and in her prior capacity as a partner of | ) | **Violation of the SC Payment of Wages Act** |
| Waccamaw Dermatology, LLC, | ) |  |
|  | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) |  |
| _____ | ) |  |

1.      That the plaintiff, Jonathan M. Banta ("plaintiff" or "Banta") is a resident and citizen of the County of Collin, State of Texas.

2.      That the plaintiff The 44 Group, LLC ("plaintiff" or "The 44 Group") is a limited liability company incorporated in the State of Texas.  Plaintiff Banta is the owner of said company.

3.      That, upon information and belief, the defendant Waccamaw Dermatology, LLC ("defendant" or "Waccamaw") is a limited liability company formed in and pursuant to the laws of the State of South Carolina.  Its partners reside in the State of South Carolina and it does business in this state with its headquarters in Horry County, South Carolina.

4.      That, upon information and belief, the defendant Joan M. Wiss, M.D. ("defendant" or "Wiss") is a resident and citizen of the County of Horry, State of South Carolina, and at all times referred to herein was a partner in the defendant Waccamaw.

1

5.    That this court has jurisdiction of the above case as, pursuant to 28 U.S.C. §1332(a)(1), the controversy at issue herein exceeds the sum of $75,000 and it is between citizens of different states.

6.    That venue for all causes of action herein lies in the District of South Carolina, Florence Division, in that, pursuant to 28 U.S.C. § 1391(b), the defendants reside and do business in this district, and a substantial part of the events giving rise to plaintiffs' claims occurred here.

## FACTS

7.    That as of 2020 (and currently) the defendant Waccamaw was in the business of providing dermatological services to the general public in five (5) separate offices in South Carolina, including its main office in Myrtle Beach, South Carolina.

8.    That at the time of the incidents complained of herein, the practice had four (4) partners who were all dermatologists working at Waccamaw: Dr. Brandon Coakley ("Coakley"), Dr. Stephen Hammond ("Hammond"), Dr. Robert Bibb ("Bibb"), and the defendant, Dr. Joan M. Wiss.  Dr. Wiss, a female, was also the managing partner of the practice until in or around June of 2021.

9.    That in or around August or September of 2020 Waccamaw and its principals began to recruit the plaintiff Banta to be its Chief Executive Officer.

10.    That at the time Waccamaw began to recruit the plaintiffs, Banta and his company, The 44 Group, were highly respected and extremely experienced in managing dermatology practices, typically occupying the role of CEO, in or around the Dallas/Fort Worth, Texas area.  Given the importance of the position, the recruitment process was extensive with plaintiffs flying to South Carolina in or around September of 2020 to meet the partners of the

practice, interview with them, and to see the facilities and the city. Although Drs. Hammond and Coakley took the lead in recruiting plaintiffs, by the time Banta's trip to South Carolina was over, plaintiff Banta had interviewed with all the partners, had a video interview with Dr. Bibb, and actually had dinner with Dr. Wiss. Thereafter, Waccamaw wasted little time in offering plaintiffs the CEO job, and plaintiffs accepted the offer.

11.    That the terms of the parties' arrangement were set forth in a CEO Consulting Agreement. In essence, the Agreement was executed on or about October 12, 2020 by the defendant Waccamaw and by the plaintiff The 44 Group, with the plaintiff Banta signing the Agreement as its principal.

12.    In pertinent part, the CEO Consulting Agreement contained the following terms:

   a)  Plaintiffs would perform CEO duties for Waccamaw;

   b)  Plaintiff Banta would perform these duties as an independent contractor (through his LLC, The 44 Group) (thought plaintiffs do not concede they were independent contractors);

   c)  Waccamaw would provide plaintiffs with office space, supplies, and a staff and pay plaintiffs $25,000 a month (or what amounts to $300,000 per year), with no benefits;

   d)  The Agreement was for six (6) months and would terminate on April 30, 2021 unless the parties decided to renew the Agreement but, to do so, the parties had to give written notice by April 1, 2021, and, if that occurred, the parties could either extend the Agreement by six (6) months or convert it to an employee-employer relationship; and

   e)  The Agreement also contained a provision that, after January 1, 2021, the defendant Waccamaw could terminate it upon sixty (60) days' written notice.

13.    That in addition to the above contract, defendant Waccamaw also provided plaintiffs with a handbook which contained a PTO policy entitling plaintiffs to receive PTO

hours.  The amount of PTO hours plaintiffs had earned and were owed were reflected on each and every paycheck plaintiffs received from Waccamaw.

14.    That once plaintiffs began working at Waccamaw, they reported to all four (4) partners.  Plaintiffs worked out of the same building as Drs. Coakley and Hammond and, as such, plaintiffs would see them on a regular, if not daily, basis.  Otherwise, plaintiffs would go to defendant Wiss' building approximately once a week on Wednesdays, just prior to the start of Wiss' clinical day, to meet with her for about fifteen (15) minutes to discuss matters concerning the practice (as she was the managing partner of the defendant Waccamaw at the time).

15.    That of course, plaintiffs fit in well with the practice.  Consistent with their experience and reputation, plaintiffs performed their job duties in an excellent, above-average fashion and maintained an exemplary employment record at Waccamaw. Under plaintiffs' leadership, the practice experienced tremendous growth and success with a number of executed initiatives approved by the partners.  While plaintiffs were never given a formal performance evaluation, plaintiffs' supervisors (the dermatologists in the practice) routinely praised plaintiffs' performance and work ethic.  Moreover, Waccamaw never disciplined plaintiffs in any shape or form whatsoever the entire time plaintiffs worked at Waccamaw.

16.    That in or around January of 2021 defendant Wiss, who was still the managing partner at Waccamaw, directed plaintiff Banta to start spending more than just fifteen (15) minutes a week with her.  In fact, she insisted that every Wednesday she and plaintiff Banta have lunch outside the office together.  In no position to disagree (and in an attempt to build a rapport with his boss), plaintiff Banta complied and began having lunch with Wiss once a week on Wednesdays at various places in town, including, but not limited to, California Dreaming, Soho, Liberty Taproom, and Blueberry's Grill.  Not only that, but Wiss began to insist that they

consume a significant amount of alcohol during these Wednesday afternoon lunches and, as a result, the lunches became much longer than they should have been – anywhere from one (1) to three (3) hours.

17.    That given Dr. Wiss' elevated position with the company and the need to develop solid relations with his boss, plaintiff felt pressured to comply with her requests that he go to the prolonged lunches with her and that he drink alcohol during the lunches.  After all, Wiss occupied the highest position in the practice at the time.

18.    That during their Wednesday lunches, Dr. Wiss would typically order two (2) shots of chilled Patron which they would both consume in one gulp.   Then Wiss would drink bourbon and plaintiff would order scotch.  The first time plaintiff Banta had one of these lunches with Dr. Wiss, Wiss told him that he could not tell anyone what they were doing (or that they were consuming alcohol at lunch).

19.    That not surprisingly, Dr. Wiss became impaired during these lunches.  But, unlike plaintiff, she was expected – indeed, she was required – to return to the office and perform medical procedures on patients.  Moreover, despite her warning to plaintiff to keep her drinking a secret, her entire staff was aware that she was impaired when she returned from lunch on those days.  Plaintiff, too, could tell Wiss was impaired by the end of their lunches.  In fact, plaintiff actually recorded Dr. Wiss encouraging him to "drink more" liquor at their Wednesday lunches.

20.    That in the meantime, the initial CEO Consulting Agreement was set to expire April 30, 2021.  As such, sometime in or around February of 2021, during one of their Wednesday afternoon lunch meetings, plaintiffs and Wiss discussed the renewal of plaintiffs' contract.  More specifically, Wiss told plaintiffs, with enthusiasm, that plaintiffs were "not going anywhere" after the current contract with Waccamaw expired and that she was officially

extending the plaintiffs an offer to work at the defendant Waccamaw for an additional year. Wiss also expressed that she even wanted to convert the parties' contract into an even longer-term Agreement soon.  The next day plaintiffs advised Coakley and Hammond that Wiss had extended their contract for another year.  The other partners did not object to the decision.  On the contrary, they expressed their approval of the new Agreement to plaintiffs and told plaintiffs they were pleased with the decision.

21.    That thereafter, on or about March 3, 2021, plaintiffs signed another CEO Consulting Agreement just like the first one, except the second one was for a ***one (1) year term***, (or specifically, for a term that was one (1) day short of a year) from May 1, 2021 to April 30, 2022.  While no one from Waccamaw signed the Agreement, the managing partner told plaintiffs the contract had been extended for a year; the remaining partners approved of the contract; Banta delivered a written contract signed by plaintiffs to defendant Waccamaw; the partnership physically accepted the signed contract from plaintiffs; and the parties all performed under the terms of the second Agreement.  No one at Waccamaw objected to or disclaimed it.  Indeed, in reliance on Wiss' extension of their CEO Consulting Agreement, plaintiffs signed a one (1) year lease on a new apartment, paying $1,800 a month in rent.

22.    That as of April 30, 2021, the defendant had not given plaintiffs thirty (30) days' written notice that the practice was renewing the said contract or converting it to an employment contract.  At the same time, as of April 30, 2021, defendant Waccamaw had not given plaintiffs sixty (60) days' notice that it was terminating the contract as it was required to do by the terms of the said first contract.  Thus, by its terms, the first contract expired on April 30, 2021, yet defendant Waccamaw insisted that plaintiffs continue to work for it as its CEO and

it accepted the services of said plaintiffs.  At the same time, defendant Waccamaw did not execute the second Agreement given to them by the plaintiffs.

23.     That in or around June of 2021 Wiss handed over management of the practice to Coakley.  Thereafter, Dr. Wiss and plaintiff stopped going to lunch together on Wednesdays.

24.     That in or around July of 2021 during a partners meeting Wiss argued that she should be allowed to work just three (3) days a week (instead of her usual four (4) days), receive full pay, but only pay 75% of her portion of the entity's expenses.  Naturally, the remaining partners objected to such an arrangement, insisting that if Wiss only wanted to work three (3) days a week and pay 75% of her share of the group's expenses, she could do so, but that her passive income would be reduced accordingly by 25%.  Conversely, she could work all four (4) days, receive her full pay, and pay her full share of the expenses.  At one point during the meeting the partners and/or Wiss asked plaintiff Banta for his opinion on the issue.  Feeling a bit on the spot, plaintiff openly agreed with the other partners, commenting he had "never before seen an arrangement like the one Wiss was requesting."

25.     That upon information and belief, Wiss was not happy with the plaintiffs' comments at the said meeting and she repeatedly told the practice's Office Manager, Laura Rice ("Rice"), that she felt betrayed by plaintiffs for not taking her side at the meeting.  At least this is what Rice reported to plaintiff Banta.

26.     That later, in or around July of 2021, Coakley and Hammond confided in plaintiffs that they no longer wanted to work with Wiss and that they had spoken to the LLC's attorney about separating Wiss from the practice legally under the partnerships' Operating

Agreement. In doing so, they also made a point to tell plaintiffs they wanted to continue to work with them.

27. That shortly thereafter, Coakley and Hammond again confided in plaintiffs, this time advising plaintiffs that Wiss had found out about the company's plans to separate her from the practice.

28. That about one week or so later (sometime in or around August of 2021), and apparently feeling she was about to be excluded from the practice, Wiss strategically, yet falsely, reported to Coakley that plaintiff Banta had sexually harassed her by touching her twice. Specifically, Wiss had reported three (3) instances of what she alleged to be sexual harassment:

    a) While plaintiff and Wiss were sitting next to one another in plaintiffs' office jointly interviewing a job candidate via a video conference, plaintiff reached over and touched her knee in a sexual manner;

    b) At California Dreaming when they both were sliding into a semi-circle booth, plaintiff's leg touched hers; and

    c) That another employee had said that plaintiff made an inappropriate sexual remark to her, even though Wiss was not present when the alleged comment was made.

29. That thereafter, Coakley advised plaintiff Banta that Wiss had made a sexual harassment complaint against him; that it involved allegations he touched her without her consent twice; and finally, he directed plaintiff to start working from home until the matter was investigated and resolved. Wiss was allowed to continue to work and to see patients on defendant Waccamaw's premises.

30. That Wiss' allegations were false in several respects and plaintiff advised Coakley of same. First, plaintiff *never* laid a hand on Wiss. He never touched her in any way. He never made any sexual advances towards her and he never made any sexual remarks to or around her. And, plaintiff never made sexual remarks to any third party.

8

31.    That in addition to the above, Wiss filed the complaint late, well after the alleged events were said to have occurred.  And, as to the third allegation – that plaintiff had made an inappropriate remark to another female employee - Wiss had prior notice of the allegation and had actually investigated it months earlier, finding the female employee's claim to be *without merit.*  Wiss never disciplined or admonished plaintiff as a result of the allegation.  In the same vein, one cannot legally allege that an incident of harassment towards another person, which they investigated on behalf of the company, created a hostile work environment for them, as they never witnessed the alleged harassment and they were investigating the claim in a Human Resource role for the employer.

32.    That also by Wiss' own admission, one of the two touchings she alleged against plaintiff took place *before* Wiss had enthusiastically extended plaintiffs' CEO Consulting Agreement and she never complained about it at the time.

33.    That based upon the above, Wiss' complaint against plaintiff was not only false and without merit (even to a layperson), but it was made in a bad-faith attempt to protect her against being expelled from the LLC by the other partners.

34.    That in the meantime, Wiss not only falsely reported the alleged harassment to Coakley but, while the investigation into her complaint was underway and pending, Wiss falsely told lower-level employees at Waccamaw, and employees at Waccamaw in general, all without a need to know and who had no authority to receive discrimination claims, investigate them, or make determinations in regard to them, that plaintiff had sexually harassed her; that he had touched her leg in a sexual manner without her consent; and that plaintiff Banta had inappropriately touched her without her consent on more than one occasion.

35.    That for example (and more specifically), Wiss falsely told her medical assistant, Erika Peterson ("Peterson"), during the course of the investigation that Banta had touched her leg in a sexual manner and that he had sexually harassed her.  Wiss also conveyed this false information to other such people.

36.    That after receiving Wiss' complaint against plaintiff, the plaintiffs were required to work from home; Wiss was still permitted to see patients at the workplace as usual; and the practice hired attorney Art Justice ("Justice") of Turner Padget Graham and Laney PA to seek his advice and guidance.  Mr. Justice, in turn, retained Amy Gaffney ("Gaffney"), an experienced employment attorney and mediator to conduct a full and impartial investigation into Wiss' complaint.

37.    That in or around August of 2021 Gaffney began her investigation, interviewing ten (10) to twelve (12) employees, including defendant Wiss' technicians, Wiss' husband and the plaintiff Banta, among others.  Ms. Gaffney's witness interviews were extensive and so was her report.  In essence, she concluded that she could not substantiate any of Wiss' allegations involving sexual harassment against plaintiffs; that many witnesses stated that Wiss intimidated her subordinates; and that Wiss should not have been taking plaintiff to lunch and drinking alcohol during working hours, especially since she had to return to work and undertake dermatology procedures while impaired.  And, while not mentioned in the report, Wiss told the investigators that she did not drink alcohol at lunch during the workday and thereby lied to the investigators – a universally terminable offense.

38.    That on or about August 21, 2021, attorney Justice prepared a written summary of Gaffney's investigative report adopting her findings and provided it to Coakley.  It held in pertinent part that:

a) The claim that plaintiff Banta touched Wiss inappropriately could not be sustained for lack of evidence; it was not reported in a timely manner; and, even if true, the incidents were too isolated to constitute a violation of law;

b) The allegation that plaintiff made inappropriate remarks to another woman proved to be unfounded;

c) Wiss and plaintiff violated policy by drinking alcohol during work hours, and all employees should be prohibited from doing so;

d) That there was another complaint against the plaintiff Banta before Wiss' complaint, but Wiss investigated it and found no discrimination. Still, the report concluded plaintiff should be counseled about being careful in his comments and encounters; and

e) It found that many employees felt uncomfortable working with Wiss due to her intimidating, aggressive, and disrespectful conduct towards her subordinates and it admonished Wiss to develop a more harmonious work environment.

39. That after the report came out, Drs. Coakley and Hammond had several discussions with plaintiff, confiding in him that (among other things) Dr. Wiss only made the harassment complaint against plaintiff as a legal maneuver to provide herself with some job protection because she found out the practice was considering ending its relations with her. They would also tell plaintiff they did not believe Wiss' allegations of sexual harassment against him; that they believed him; that they still wanted to work with plaintiffs; that they still wanted to sever ties with Wiss, but they were concerned if they did so too soon after her complaint, that Wiss could take legal against against them.

40. That soon enough though, Drs. Coakley and Hammond began telling plaintiffs that, because of the above circumstances, that plaintiffs may have to leave the practice temporarily then return after they safely severed relations with Wiss. In the same breath, the

11

other three (3) partners repeatedly told plaintiff that he was "getting screwed" but that they were only following legal advice.

41.    That on or about September 21, 2021, Dr. Coakley sent an email to plaintiffs (and copied it to the Bellamy firm in Myrtle Beach, South Carolina) taking the position for the first time that, while the parties' initial (or first) CEO Consulting Agreement, which contained a six (6) month term until April 30, 2021, was valid since both parties signed it, the second CEO Consulting Agreement with the one (1) year term was not, since the practice never signed it.  As such, the defendant Waccamaw took the position that, since the first contract ended, plaintiffs became an employee at-will the day the first CEO Agreement ended on April 30, 2021.

42.    That the email went on to state that as such, plaintiffs' last day of work at the practice would be October 31, 2021 and that Banta could prepare an announcement to staff regarding his departure if he so desired.  At the same time, Coakley and Hammond assured plaintiffs that this was just part of a bigger plan to sever Wiss from the practice.  Coakley and Hammond also assured plaintiffs, in strong and mandatory terms, that as soon as they separated Wiss from the practice, they would call the plaintiffs back to work and/or have them work for them.  They also encouraged plaintiffs to take legal action against Wiss and stated that they believed that the plaintiffs would prevail if they pressed legal claims against Wiss under the circumstances.  Of course, plaintiffs relied on these remarks and did not fight the process.

43.    That indeed, on or about September 28, 2021, with no choice in the matter, plaintiffs sent an email to Waccamaw's staff stating they would be resigning effective October 31, 2021 and came up with some reasons for the decision.  But that is not what plaintiffs wanted to do.  Plaintiffs wanted to work at Waccamaw for several more years as they were asked to do by Waccamaw at their initial interview with the practice and as they had made a commitment to

do at that time.  Had defendant Waccamaw allowed plaintiffs to complete their tasks at said defendant, plaintiffs would have received a compensation package (that was discussed during the interview process) that would have included a ten (10%) percent equity position in the entity, or the equivalent commission when the business sold.  Indeed, said element of compensation was discussed with defendants during the interview process and it is a term that is consistent with industry standards.  As a result, the defendants constructively discharged the plaintiffs, as defendant Waccamaw told plaintiffs they would be fired if they did not resign.

44.    That after a significant period of time passed since plaintiffs' dismissal, Waccamaw severed its ties with Wiss, but still allowed her to perform procedures at the facility. Still, it never called plaintiffs back to work as promised; it never paid them for the unexpired six (6) months left on the second CEO Consulting Agreement ($150,000), their moving expenses from Myrtle Beach ($2,000), 92.4 hours of PTO ($13,860), the remaining amount they owed on the lease of their new apartment they rented in reliance on their contract extension ($7,200), or for the ten (10%) percent equity position.

**FOR A FIRST CAUSE OF ACTION**
**SLANDER PER-SE**
**AGAINST BOTH DEFENDANTS**

45.    That plaintiffs hereby repeat and reallege each and every allegation in Paragraphs 1 through 44 hereinabove as fully as if set forth verbatim.

46.    That defendants published the following false and defamatory statements about the plaintiffs:

a) Defendant Waccamaw, by and through the defendant Wiss, told lower-level employees at defendants, other employees of defendants, patients, and members of the community, all without a need to know (and before the investigation was concluded), that plaintiff Banta sexually harassed her and other female employees; that plaintiff Banta touched her body in an

inappropriate manner; that plaintiff Banta sexually assaulted Wiss; and that plaintiff Banta made sexual remarks and advances towards her and other female employees; and

b) Defendants sent plaintiff Banta home and/or suspended plaintiffs immediately after Wiss made her false allegations of harassment against him (while allowing Wiss to continue to stay on the premises and work) and defendants then fired plaintiffs shortly after defendants conducted an open and widespread investigation into Wiss' allegations of sexual harassment/assault against the plaintiffs – an extensive and well-known investigation which occurred, at least in part, on premises and which involved the defendant Waccamaw hiring two (2) separate attorneys from separate law firms interviewing at least ten (10) to twelve (12) witnesses.  The timing of the above events constitutes publications which gave employees of the practice, its patients, and members of the community the false impression and belief that plaintiffs had sexually harassed and/or assaulted Wiss and other female employees at the defendant Waccamaw and that plaintiffs were fired for engaging in such conduct.

47.   That all of the statements or publications referred to above concerned the plaintiffs, are false, and were made by defendants without justification, without privilege and with implied and actual malice.

48.   That the statements referred to above are actionable per-se, in that they allege plaintiffs committed the crime of assault and battery or sexual assault and in that they allege plaintiffs are unfit to carry on in their given trade and profession.

49.   That defendants' publications as outlined above had a defamatory and slanderous meaning, impeached the honesty and integrity of the plaintiffs and thereby exposed them to public hatred, contempt, ridicule, and caused them to be shunned and avoided and to suffer loss to their reputation, embarrassment, humiliation, emotional distress, pain and suffering, and loss of enjoyment of life.

50.    That defendants' actions as outlined above resulted in special, general and presumed damages to the plaintiffs.

51.    That as a direct result of defendants' conduct as set forth above, plaintiffs have suffered damages in the form of loss to reputation, lost back and future wages, income and benefits, costs associated with finding other work, psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to professional standing, character and reputation, embarrassment, humiliation, physical and personal injuries and prejudgment interest.

52.    That defendants' conduct as described above was undertaken by defendants intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the protected rights of the plaintiffs and, therefore, plaintiffs are entitled to recover punitive damages from the defendants.

**FOR A SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT**
**AGAINST DEFENDANT WACCAMAW**

53.    That plaintiffs hereby repeat and reallege each and every allegation in Paragraphs 1 through 52 hereinabove as fully as if set forth verbatim.

54.    That on or about October 12, 2020, defendant Waccamaw and plaintiffs entered into a CEO Consulting Agreement wherein plaintiffs agreed to perform CEO duties for the defendant Waccamaw's dermatology practice and said defendant agreed to compensate plaintiffs for said services.

55.    That pursuant to Paragraph six (6) of the Agreement, the said contract was for a term of six (6) months commencing on October 26, 2020 and ending April 30, 2021,

"unless both parties provide express written intent to renew said Agreement on or before April 1, 2021."

56.    That if the parties expressed their written consent to renew said contract by April 1, 2021, then the same Paragraph Six (6) of the Agreement provides that, in doing so, the parties could either extend the Agreement for an additional six (6) months, or they could agree to convert the existing arrangement to an employee-employer relationship – but, again, to accomplish the above, the parties had to give notice by April 1, 2021.  Otherwise, Paragraph Six (6) of the Agreement further provides that, after January 1, 2021, the defendant Waccamaw could terminate the Agreement upon sixty (60) days' written notice.

57.    That as alleged, plaintiffs performed their job at defendant Waccamaw in an above-satisfactory fashion and in a manner that met the said defendant's legitimate expectations. They fully complied with all conditions and obligations imposed upon them by the said Agreement.

58.    That prior to the end of said contract term, in or around February of 2021, defendant Wiss, who was the managing partner of the defendant Waccamaw at the time, with full authority to bind the company, told the plaintiffs that plaintiffs were not going to stop working for the practice after the six (6) month term of the first contract expired; and that she was officially extending that contract (or entering into a new one with plaintiffs) for an additional one (1) year term.  Plaintiffs immediately accepted the offer.

59.    That the next day, plaintiff Banta told the other partners of the defendant Waccamaw, Coakley and Hammond, that Wiss had extended plaintiffs' contract for an additional year.  In response, Coakley and Hammond both expressed their approval of the extension to plaintiffs.  None of the partners objected to it.

60.    That on or about March 3, 2021, plaintiffs prepared a short CEO Consulting Agreement, signed it, and provided it to the defendants.  Defendants fully accepted the second Agreement from plaintiffs without objection, without returning it to plaintiffs, and without advising plaintiffs to cease performing services for said defendant.

61.    That according to Paragraph One (1) of the second Agreement, plaintiffs would commence services for the defendants on May 1, 2021 and, according to Paragraph Six (6) of the said Agreement, the contract was set to automatically terminate one (1) day short of one (1) year later, on April 30, 2022, and it "could be renewed or converted to an Employment Agreement with thirty (30) days' written notice."  Otherwise, the second Agreement was identical or similar to the first Agreement in many ways, only shorter.  For example, it did not contain a provision that the defendant Waccamaw could terminate it with sixty (60) days' notice.

62.    That as of April 1, 2021, the defendants had not given plaintiffs written (or verbal) notice of its intent to renew the first Agreement for another six (6) months or a notice to convert the Agreement to an Employment Agreement as it was required to do pursuant to Paragraph Six (6) of the first Agreement. Likewise, by that time the defendant Waccamaw had not given a sixty (60) day notice to terminate the Agreement to plaintiffs.  As such, by its own terms, the first contract automatically terminated on April 30, 2021.  At the same time, the defendant Waccamaw had not signed the second Agreement which plaintiffs had provided to them.

63.    That nevertheless, after the first contract expired on April 30, 2021, the defendant Waccamaw insisted that plaintiffs continue to perform the duties of their CEO job for said defendant, and the plaintiffs continued to work at the defendant Waccamaw with

Waccamaw continuing to pay plaintiffs and accept the benefit of their services, all in a manner consistent with the terms of the second contract.

64.     That the second contract was binding and enforceable on the parties, even though the defendant Waccamaw did not sign it, as the managing partner of the practice advised plaintiffs in clear terms that she was extending the first contract or entering into a new one with the plaintiffs for an additional one (1) year term; she conveyed to the plaintiffs, on behalf of defendant Waccamaw, that the contract was extended by virtue of her verbal assurances, for a one (1) year term; and the plaintiffs accepted the offer.  Moreover, the defendant Waccamaw, by and through its partners, adopted the second Agreement by:

a)  failing to give notice to plaintiffs under the express terms of the first contract that it was electing to terminate the contract, extend it, or to convert to an Employment Agreement, as defendants knew such an act was unnecessary because they already extended the first contract or entered into a new one with the plaintiffs for a one (1) year term;

b)  by directing the plaintiffs to continue to work for it and on its behalf as its CEO and by accepting plaintiffs' services, all after the first contract expired, and all after plaintiffs provided said defendant with a signed contract for a term of one (1) day less than one (1) year;

c)  by physically accepting the second contract from plaintiffs without ever objecting to it, returning it, or advising plaintiffs to cease working; and

d)  by continuing to perform under the new contract by, among other things, paying plaintiffs the salary it contemplated in that Agreement and by directing and allowing plaintiffs to continue to work at defendant.

65.     That since the second employment contract was for a one (1) year term (or a term one (1) day short of one (1) year), and since it was otherwise silent on the issue, under

South Carolina common law, the defendant had to have just or good cause to fire plaintiffs or to otherwise end its relationship with plaintiffs.

66.    That on or about September 21, 2021 (with approximately six (6) months remaining under the terms of the second contract), defendant sent an email to plaintiffs terminating plaintiffs' services as CEO of the company and stating that plaintiffs' last day of work would be October 31, 2021.

67.    That defendant Waccamaw terminated its contract with plaintiffs without good or just cause, without notice, and for false reasons, and thereby said defendant breached the contract it had with plaintiffs.

68.    That moreover, before, during and after the time defendant breached its contract by terminating plaintiffs' services, said defendant repeatedly promised plaintiffs in clear and mandatory terms that it would call plaintiffs back to work once it separated Wiss from the practice.

69.    That said promises and assurances constituted an enforceable promise and a contract.

70.    That the said defendant ultimately separated Wiss from the practice, but did not call plaintiffs back to work, thereby breaching that contract.

71.    That as a direct and proximate result of defendant's breaches of the parties' Agreement, plaintiffs have suffered damages in the form of lost back and future wages, income and benefits for the unexpired portion of the parties' second contract and any extension thereof, and for the period of time when plaintiffs should have been called back to work (after Wiss' separation) as per the defendant's promises, a ten (10%) percent equity share in the business which, pursuant to industry standards, plaintiffs would earn after their work at defendant was

finished, moving expenses, earned and unpaid PTO time, the costs of renting a new, more expensive apartment under a one (1) year lease in reliance on defendant's promise that plaintiffs would be working at the defendant for an additional year, other economic damages, and for such other relief as the court deems appropriate.

**FOR A THIRD CAUSE OF ACTION
BREACH OF CONTRACT
HANDBOOK
AGAINST DEFENDANT WACCAMAW**

72.    That plaintiffs hereby repeat and reallege each and every allegation in Paragraphs 1 through 71 hereinabove as fully as if set forth verbatim.

73.    That in addition to the contracts described in plaintiffs' Second Cause of Action above, defendant Waccamaw issued an employee handbook to plaintiffs which contained the work rules and obligations of the parties.

74.    That the said handbook contains a PTO policy on page 25 which entitled employees and workers at defendant to accumulate and be paid for PTO hours, including being paid said PTO hours after separation from defendant.

75.    That said handbook and its PTO provisions applied to plaintiffs; and the PTO provision is couched in strong and mandatory terms.

76.    That as such, the said handbook constitutes a contract of employment which altered any at-will employment relationship that may have existed between the parties.

77.    That while working for defendant, plaintiffs performed their contractual duties in a satisfactory fashion and therefore met all obligations and conditions imposed upon them by the said contract.

78.    That while working as the defendant's CEO, by the time of plaintiffs' termination from defendant, plaintiffs had accumulated 924 hours of PTO leave which, based upon plaintiffs' rate of pay, equals $13,327.

79.    That in (and after) separating plaintiffs from its payroll, defendant failed and refused to pay plaintiffs their earned PTO hours, despite written demand, and thereby breached its contract with plaintiffs.

80.    That as a direct result of defendant's breach, plaintiffs have suffered damages in the amount of plaintiffs' earned PTO hours which equal $13,327, plus prejudgment interest.

**FOR A FOURTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
**ACCOMPANIED BY FRAUDULENT ACTS**
**AGAINST DEFENDANT WACCAMAW**

81.    That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 80 hereinabove as fully as if set forth verbatim.

82.    That as alleged above, plaintiffs had two (2) or three (3) employment contracts with defendant Waccamaw.

83.    That as alleged above, defendant Waccamaw breached said contracts.

84.    That defendant Waccamaw breached said contract with fraudulent intentions.

85.    That defendant Waccamaw engaged in fraudulent acts which accompanied the breach, namely, it fired or constructively discharged plaintiffs for false reasons, and it falsely promised plaintiffs that it would call plaintiffs back to work after it separated ties with the defendant Wiss, an assurance said defendant did not undertake, and never intended to do so.  As

such, all of the defendant's breaches of its contracts with plaintiffs were accompanied by fraudulent acts.

86.   That as a direct result of defendant Waccamaw's conduct as set forth above, plaintiffs have suffered damages in the form of lost back and future wages, income and benefits, costs associated with finding other work, moving expenses, unpaid PTO time, the costs incurred by plaintiffs for leasing a new apartment for a one (1) year lease term in reliance on said defendant's promises, a ten (10%) percent equity share in the defendant Waccamaw's practice, psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to professional standing, character and reputation, embarrassment, humiliation, physical and personal injuries, and prejudgment interest.

87.   That defendant Waccamaw's conduct as described above was undertaken by defendant intentionally, willfully, wantonly, recklessly, maliciously, and with utter disregard for the protected rights of the plaintiffs and, therefore, plaintiffs are entitled to recover punitive damages from the defendant.

### FOR A FIFTH CAUSE OF ACTION
### PROMISSORY ESTOPPEL
### AGAINST DEFENDANT WACCAMAW

88.   That plaintiffs hereby repeat and reallege each and every allegation in Paragraphs 1 through 87 hereinabove as fully as if set forth verbatim.

89.   That defendants made a clear and unambiguous promise to plaintiffs by assuring them that plaintiffs had an additional one (1) year contract with defendant and by assuring them (around the time that said defendant breached the said Agreement by terminating plaintiffs) that defendant Waccamaw would call plaintiffs back to work after it severed ties with the defendant Wiss.

90.     That plaintiffs reasonably relied upon said promise.

91.     That it was expected and certainly foreseeable by the said defendant that the plaintiffs would rely on said promise.

92.     That said defendant breached both of the said promises it made to plaintiffs.

93.     That plaintiffs sustained injury by relying on the said promises, as plaintiffs, among other things, signed a one (1) year lease for a new apartment in reliance on the said promise, and plaintiffs were further injured in the form of lost wages, income and benefits they would have earned had defendant not breached the parties' Agreement to begin with, and in the form of the amounts plaintiffs would have earned had said defendant called them back to work as promised.

**FOR A SIXTH CAUSE OF ACTION**
**VIOLATION OF THE SOUTH CAROLINA**
**PAYMENT OF WAGES ACT**
**AGAINST DEFENDANT WACCAMAW**

94.     That plaintiffs hereby repeat and reallege each and every allegation in Paragraphs 1 through 93 hereinabove as fully as if set forth verbatim.

95.     That the earned and unpaid PTO time owed to plaintiffs constitutes "wages" under the *South Carolina Payment of Wages Act* ("SCPSW").

96.     That defendant Waccamaw failed to pay plaintiffs said wages within forty-eight (48) hours of plaintiffs' separation from the payroll or by the next pay period, or within thirty (30) days.

97.     That as such, defendant violation to SCPWA.

98.     That defendant Waccamaw violated the SCPWA intentionally and knowingly and, thus, plaintiffs are entitled to the amount of wages due, treble (or triple)

damages, prejudgment interest, and the costs and disbursements in the case, including their reasonable attorney's fees.

WHEREFORE, plaintiffs pray for the following relief against the defendants:

a)  As to plaintiffs' First Cause of Action for slander (against both defendants, jointly and severally), for such an amount of actual and special damages as the trier of fact may find (including loss to reputation, lost back and future wages, income and benefits, expenses associated with finding other work, moving expenses, unpaid PTO hours earned, a ten (10%) percent equity share in the defendant Waccamaw, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the costs and disbursements of this action, prejudgment interest, and for such other and further relief as the court deems just and proper;

b)  As to plaintiffs' Second, Third and Fifth Causes of Action, for such an amount of actual and special damages as the trier of fact may find (including damages for lost back and future wages, income and benefits, economic injury, as well as expenses associated with finding other work, expenses related to moving, all earned unpaid PTO hours due, the cost or value of renting a new apartment under a one (1) year lease term, a ten (10%) percent equity share of the defendant Waccamaw, the costs and disbursements of this action, prejudgment interest, and for such other and further relief as the court deems just and proper;

c)  As to plaintiffs' Fourth Cause of Action, for breach of contract accompanied by a fraudulent act, for such an amount of actual and special damages as the trier of fact may find (including damages for lost back and future wages, income and benefits, expenses associated with finding other work, moving expenses, unpaid PTO time, the costs of renting a

new apartment under a one (1) year lease in reliance on defendant's promises, a ten (10%) percent equity share of defendant Waccamaw, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the costs and disbursements of this action, prejudgment interest, and for such other and further relief as the court deems just and proper; and

d)   As to plaintiffs' Sixth Cause of Action for violation of the *South Carolina Payment of Wages Act*, for the amount of wages due, treble damages, the costs and disbursements of this action, including reasonable attorney's fees, prejudgment interest, and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By:  s/A. Christopher Potts
Federal ID No.:  5517
222 West Coleman Blvd., Suite 124, #11
Mt. Pleasant, SC 29464
Telephone:  (843) 577-5000
Email:  cpotts@hitchcock-potts.com
**Attorneys for the Plaintiffs**

Charleston, South Carolina
May 18, 2023